All right, Ms. Hutchinson, you're up, Pam. Good morning. Good morning. May it please the Court. This is a very graphic case, but it's not a close one. The evidence in this case that Rice's application of discipline was discriminatory based on gender is overwhelming. Doe was an incoming freshman at Rice with a full scholarship and was the starting quarterback. He began a relationship with Roe that included a sexual relationship that continued on for some time, and they had a discussion before they began consensual sex about their sexual histories, and Doe informed Roe that he had had herpes, and they had some discussion about that. Roe was three years older. She'd been at Rice for some time. She was a consenting adult who chose then to have unprotected sex. She then, during a break, began texting Doe, who was with his mother at the time. They were shopping. It was Christmastime. She was blowing up his phone with these text messages that she found out that she had herpes, and he texted her back just apologizing because he was just trying to silence the conversation at that time and maybe address it later. She then filed a complaint with Rice University that was taken up by their Title IX coordinator, Ms. Garza, and overseen by Mr. Osterdick, and they ended up charging Doe initially with dating violence, and then they immediately, without giving him an opportunity to respond... Can I ask, this doesn't have anything to do with dating violence, though. This is at all times consensual behavior, right? I mean, what does dating violence have to do with this? I have no idea. It was 100% consensual. There were no threats, no allegation of assault, no allegation of lack of consent. Did the police report say that there had been violence or something? No. As a matter of fact, the police declined to press any charges, both the university police and the... But even the report she made didn't say that she had experienced violence or any kind of thing like that. Correct. Her initial report to the police said that Doe never told her that he had herpes, but she changed that and admitted later that he did tell her and that they'd had a discussion about it, and he told her he had it in high school. The fact that her story changed repeatedly, that Rice admits plainly, even in their brief, I think, that she changed her story constantly and that he was consistent. What is your client... What is the relief you seek at this point? This is not like in the TCU case where Judge O'Connor issued a TRO or preliminary injunction and said you cannot force this student off campus or that sort of thing. That's already happened. We're way beyond that now. Way beyond that. So what is the relief you seek? Damages. It's only monetary damages? Is it injunctive relief to keep something off his transcript? Is this prior to the new state law that requires it to be put on... It's not dating violence, so I don't know if that new state law would apply, but Title IX action. Right. Yeah. The relief that he sought in this lawsuit was money damages. Money damages. OK. So he's not trying to get back in state, reinstated at school or on any... You're not seeking NCAA relief or anything? Nothing like that. He was kicked off campus and not allowed to play football and not allowed to finish his classes. In effect, he was kicked out. And so he had to leave and go to another college. But he lost a full-ride scholarship at Rice University and a position as a quarterback. That was very significant to him. He underwent a lot of trauma as a result of this. When they first kicked him out, they... Let me ask you. The upshot of the violation against Joe is that he either insufficiently informed Roe or inadequately informed her of his having heartbeats. Is that the violation? Yes, Your Honour. They concede that he informed her. Their position is he did not adequately inform her because she alleges that he didn't... But what does he contend he told her? That he'd had it in high school and that he also contends that he did not understand that if you're not having a current outbreak, that it was contagious. In fact, in the text message that was the patient... He didn't understand that it's not curable and that once you get it, you got it. You're saying he didn't understand that, so therefore he didn't tell her that. He didn't understand that it was contagious if there wasn't some sort of ongoing outbreak. Isn't that the situation, though? You have to be in an outbreak situation to infect someone? Not necessarily, Your Honour. Okay, so there can be... But usually it would be if you have an outbreak, that's when you're supposed to avoid sex. That's my understanding. This is not my first herpes case in the Fifth Circuit. So is that... Okay, so it's usually that situation, but you can actually give it to someone even if you're not having an outbreak. Yes. But we don't know whether his partner or the complainant had got herpes from him at all, though, do we? No, because Rice prevented him from providing any evidence with respect to that. All right, so could I get back to what he contends he told her? At the time they had the conversation about herpes, what does he say he told her? Because as I understand the violation, the violation is she was insufficiently or inadequately informed. So I just want to know what he says he told her. That he had contracted it in high school. And then that was the end of that conversation? He said it was a brief conversation. They were comparing their sexual histories. It was a brief conversation. He told her he had contracted herpes in high school. And didn't she know a lot about herpes? She had been, actually, she had been allegedly getting screened for it long before she ever met Mr. Doe. And so the extent of her knowledge is a little unclear because Rice said it was irrelevant and wouldn't ask her about that and wouldn't allow her to be cross-examined about that and wouldn't allow Doe to present a witness who freely said he would testify and gave his identity, that she had actually given it to him before she ever met Doe and that she herself did not disclose to Doe that she had it. Rice wouldn't consider that, wouldn't allow him to present that witness, and wouldn't refuse to even call the witness or discuss it with him. How can it be insufficient if the person already knows? I mean, if you say I have it and that person already knows, how is that insufficient? Rice would not address that or take that into consideration and said it was irrelevant. They would not consider the extent of her knowledge. Are you seeking separate damages for the period at which he was immediately thrown out of the dorm or the residence hall, whatever it's called? Yes. Because there's different time periods. There's, like, what happened ultimately, but there's during the investigation time period. Yes. That he was removed, right, immediately. He was given 24 hours. This is a kid from a completely different area who was not familiar with Houston and had just started school there, and they gave him 24 hours to pack his stuff, leave the dorm, find someplace else to live and not come back on campus. Let me ask you something different, more G-rated questions. Because, I mean, this is one of these cases we could probably be talking all morning about all this stuff, but, you know, it comes to us through these text messages, you know, the back and forth. You say, you know, there's disparities as to who knew what when and so on and so forth. I personally choose to not spend the whole morning talking about that because we can read it, but I'm trying to zero in on a question that Judge Elrod asked you earlier, you know, in terms of relief. You know, here, he's gone, so it's not reinstatement. He wants money. Procurement law instructing the Army used to say when they tell you it's the principal, it's the money. And that tends to be, must be the case, it's the money. So I'm trying to get to, are you wanting us to declare that the Title IX procedure process by Rice was, you know, infirmed so that, you know, everything should be thrown out? I mean, not deciding these credibility issues. I'm trying to cut to the chase, if you will, on what's before us. It's not reinstatement. You said it's money. So are we to look at this process and say, you know, there's due process violations, it was unfair, yada, yada, throwing it out. And how do we get there, the best case you've got? I mean, we've got other cases here, but I'm trying to zero in on, you know, exactly at the end of the day, regardless to which one of these people we believe, you know, and all that kind of stuff, where are we? You understand the tenor of my question? Yes, Your Honor. The district court granted summary judgment, and so, of course, we're seeking for that to be reversed. And based upon the Yusuf case out of the Second Circuit set forth procedures for assessing whether or not discrimination occurred in the application of the discipline under a Title IX complaint. And that was adopted by the Fifth Circuit in the Clock case. And then the TCU case recently that came out of the Northern District, the Fort Worth Court of Appeals, is pretty strong. I mean, I would say that's pretty strong support for our position in this case. For the reasons of, you know, showing that there was a gender bias that resulted in an erroneous outcome, and also for selective enforcement. The evidence of selective enforcement is very strong, because, first of all, they... Do we have to make a determination on gender bias as such, or do we... I know you'd want us to, but I'm saying, since it's on summary judgment, is it narrowest if we were determined that summary judgment was inappropriate and sent it back for whatever other process without us having to unpack the rest of this? You understand my question? I know you're alleging gender bias, and you know we got out this who said what and so on and so forth, but somehow that just doesn't seem to be what I ought to be doing. Well, Your Honor, I think at the very least, there are substantial fact issues that should have prevented summary judgment. That's what I'm trying to get to. The vehicle that it's here on, I know you've got to paint the picture of the context of this, and we get it very much, but in the limited time of just where are we on the Title IX process, in other words, is there a legal error which infirms the summary judgment, and if so, zero in to me what the legal error is in which we would reverse summary judgment, or is it factual error that's infected by the legal error to which? Do you follow? Yes, Your Honor. I believe that the district court improperly weighed the facts in favor of Rice University and disregarded a substantial amount of evidence and facts that were presented by the plaintiff in this case, and because the district court gave weight to disputed facts on the side of Rice University, I think that that is what requires the reversal to send back, to reversal the summary judgment and to send back. I also wanted to address very quickly a supplement that was filed by Rice with respect to the Cummings case and whether or not there can be mental anguish damages in a Title IX case, and to point out that Rice University has completely 100 percent waived that argument because the Cummings case actually came out of this court, the Fifth Circuit, in 2020, and Rice University did not address it in its motion for summary judgment, did not address it or brief it in the appeal, and only addressed it by a supplemental letter. And so, of course, you can't raise an issue for the first time on appeal that you could have raised below, and since it came out of the Fifth Circuit in 2020, it certainly could have been raised at any time prior to the time they filed their letter supplement in this case. So, basically, to close, Your Honors, this is a case where there was no allegation of threats of violence, there was no allegation of assault, there was no allegation of nonconsensual sex, there was two people, two consenting adults that discussed their sexual history, and Rice University acted in a way that was very gender-biased and discriminatory. All right, Counsel. I said I wouldn't, but do you feel like you got a chance to present all your main points? Yes, Your Honor. Sure? Because I'll give you two extra minutes, because I sold you off and I don't want you to be limited on rebuttal, because there's a lot here. No, Your Honor, I feel very comfortable, and I'm happy to address anything else on rebuttal. Solid. All right. Let's hear from Counsel Opsen. May it please the Court, Emily Smith on behalf of Rice University. After a fair, impartial, and gender-neutral investigation, Rice University concluded that John Doe failed under the Rice Student Code of Conduct to adequately inform his sexual partner, Jane Rowe, of his known and incurable sexually transmitted disease prior to engagement. I thought that Rice conceded that Doe did tell Rowe that he had herpes in high school. The evidence shows that, Your Honor, all that he told Ms. Rowe prior to engaging in unprotected sex with her was that he had had a, quote, run-in with herpes. Run-in with herpes in high school. That seems like a reasonable jury could find that that was he had herpes in high school. A run-in, Your Honor, to me could imply several things. It could imply a close call. It could imply a temporary situation. But what it is that the university decided was that that language, a run-in with herpes in high school, was insufficient under the Code of Conduct to adequately inform Ms. Rowe of the risks and ramifications of having unprotected sex with Mr. Doe. Does he have a duty... Did he have a duty to inform her about publicly available information about herpes and its transmissible risk? Yes, Your Honor. Why, if she also could have access to publicly available information about herpes? Certainly, Your Honor. What Rice University did is they applied an objective standard here. So under the Code of Conduct, they expect all of their students to have a high expectation of civility and respect for other students. And in this case, they place a burden on the carrier of the disease in order to inform the person that they intend to have sexual contact with of the risks and ramifications of the disease. It's not that they put a burden on Mr. Doe that was higher because he was a man. They put a burden on Mr. Doe to inform Ms. Rowe, regardless of what her knowledge of herpes was at that time, to inform her prior to that sexual encounter. Well, actually, didn't they have Dane Osterdick, or how do you say it, Osterdike? Osterdick. Osterdick. I'm sorry? Osterdick. Osterdick said that counseling in a professional setting would be appropriate for Rowe to deal with her herpes in future sexual activity, whereas for Doe, retroactive imposition of a duty to disclose technical medical details that were publicly available would be required. So that doesn't seem gender neutral. Isn't that at least a fact issue, that he treated her disclosure obligations differently than Rowe does? The Doe and the Rowe can be confusing, yes, Your Honor. No, in this case, the comments that Mr. Osterdick was making were in a different circumstance. Ms. Rowe had made some comments that she might, in the future, not reveal her sexual transmitted disease that she now knew that she had. In fact, she was already not revealing it and already having unprotected sex at the same time as the investigation. No, Your Honor. Actually, that's not what the record reflects. The record reflects that she may have had a sexual relationship, apparently based on some information Mr. Doe had, with this other student, A.C. That occurred prior to the relationship with Mr. Doe. And the record indicates that Ms. Rowe did not know that she had herpes until after her sexual relationship with Mr. Doe. So the first time the record reflects that she became aware of her herpes diagnosis was after her relationship with Mr. Doe. But going forward, the dean didn't say, well, you'd be violating our policies of civility, et cetera. That's true, Your Honor. He did not say that in his deposition. However, the difference between Ms. Rowe and Ms. Doe that's critical here and that we've emphasized in our briefing is that there was never any complaint issued against Ms. Rowe. He was making a complaint. Mr. Doe was making a complaint? Yes. But when you respond in a Title IX investigation and you say they're also doing this, then they have to open up a file on the complainant because it's not just a race to the Title IX office. That's a well-documented issue in Title IX. I understand, Your Honor. In this case, what the Code of Conduct puts forth is that the university is a report-based system. This SJP office is a report-based system. Now, Mr. Doe argues that he himself made a report related to Ms. Rowe's conduct, which I think is what you're referring to, Your Honor. But I would encourage the Court to look at specifically Mr. Doe's letter that he wrote and the complaint that he argues that he made. That letter was written in response to Ms. Doe's complaint. He filed it in response to it. But that's irrelevant for whether his thing is a complaint, right? Certainly, Your Honor. A complaint can be made in any form. It could be both written or oral. But the key problem with Mr. Doe's letter is that he doesn't actually make a code violation allegation in that letter. Does he have to use those words, or is it the duty of the Title IX personnel to follow up and say, do you want to make a code violation? It is certainly not on him to use. There's no specific wording that he would have had to have used. But I would note that in that letter, he doesn't actually allege a violation of the complaint. And if I could, Your Honor, I'd like to detail exactly why he doesn't allege a violation of the complaint, a violation of the code, excuse me, in that letter. He doesn't allege, first off, that he got herpes from Ms. Rowe, nor could he. He already knew that he had herpes prior to the sexual contact that he had with Ms. Rowe. He also does not allege that Ms. Rowe knew that she herself had herpes prior to the sexual contact that she and Mr. Doe had. Third, he does not allege that Ms. Rowe knew that she had herpes prior to her sexual relationship with A.C., the other student that he references in that letter. And even if she did know at that time, there's no allegation that she failed to tell A.C. or that she failed to use protection. And there's certainly no indication in the record, Your Honor, that there was ever a complaint filed by A.C. He certainly could have filed a complaint had he wanted to, but there was no complaint ever filed. And, in fact, Your Honor, I would emphasize that it wouldn't have made sense for this letter from Mr. Doe to be a complaint. He wasn't complaining about Ms. Doe's failure to disclose her sexually transmitted disease to either A.C. or to him, because by doing that he would have effectively been admitting that he himself had failed to adequately disclose his sexually transmitted disease to Ms. Rowe. Is there any evidence in the record that the dean did any kind of even counseling or something that would say, you cannot just go out and infect the population because you're mad at this other gentleman? Are you speaking of Ms. Rowe? Yes. When she gives this outburst that she's just going to go infect everybody on campus, isn't that not a fair characterization? No, that is, Your Honor. Isn't that a fair characterization which she's made, which may have been under pressure or sadness or emotional duress or something. But doesn't the dean have a duty to then tell her of her duties under the code of Rice University? The record reflects that she wasn't given any particular counseling. I'm not aware of any counseling that occurred afterwards. However, she herself was equally aware of the code, as Mr. Doe was, and so there was no extra sort of counseling that she received as opposed to Just say, don't do premeditated intentional herpes infection. I don't know of anything in the record that reflects that she received any sort of counseling or warning prior to. Okay. Can you tell us about the initial investigation? Because it's unclear to me why the university would have ever removed him when it seems that he cooperated throughout the investigation. Yes, Your Honor. So after the initial complaint was made by Ms. Rowe, she provided the text messages between Mr. Doe and herself, and the university's dean of undergraduate, Mr. Ostick, made a decision under the terms of the Code of Conduct that Mr. Doe needed to be removed from campus  Did he indicate that he was going to go have sex unprotected with anybody? Why was he a risk to the population? He wasn't an assaulter. The fact that someone may have gotten herpes from him, which we're not even sure happened, and probably didn't happen if she may have had it before, then why would he be a risk? The concern was that he, based on the text message conversations and not immediately responding to Ms. Garza, that he was not taking the process seriously. Now, that may have been a quick decision, and certainly we concede it was a very quick decision by Mr. Ostick. Within a day or so. Indeed, yes, Your Honor. It was within a day he was responding. Yes, that's correct, Your Honor. It was a very quick decision, but that is a decision that he, as the dean, is empowered to make under the code. He is allowed to interimly suspend students, remove them from campus, and bar their ability to participate in extracurricular activities to the extent, and it's an objective discretionary standard, but to the extent that he feels that they are a risk to the well-being of the students on campus. And I'll note that as soon as Mr. Doe, about three weeks later, as soon as he provided his response, was there a showing anywhere that he had consistently taken that approach with other, not necessarily herpes, but, I mean, other violations? In other words, does any of the records show that that was a consistent reaction to either banish people or whatever, as a matter of course, as opposed to, as counsel opposite is alleging, that here this was discriminatorily focused on this plaintiff? Right. No, there is no other evidence that I'm aware of in the record that indicates that this was a pattern of behavior, which I think is, if I'm fairly characterizing your question, Your Honor. But, again, this is something that the dean was permitted to do under the code, and I'll note that there's no indication in the record that this decision that Mr. Austic made was based on Mr. Doe's gender, even if it was a very quick decision. Don't they have an obligation, though, to provide him with other suitable housing? If he hasn't been adjudicated guilty, he can be removed, but you can't just throw him out on the street. Under the Code of Conduct, he can be removed from campus, and there is no obligation on the university to provide him alternative housing. Even when there's been no finding, because normally, while they're pending, they are put into a stasis until they actually have a finding of liable, or whatever the term is. I understand, Your Honor, but, no, there is no requirement that there be a finding prior to the interim system. Can we talk about due process? Yes, Your Honor. I believe that they're arguing that the process was not appropriate in the procedure and in the appeal. Was there a hearing? There was no hearing, Your Honor. There is no separate due process claim. I'll note that. This is solely a Title IX claim that Mr. Doe brings. In the context of the Title IX claim, he argues that Mr. Doe did not receive due process. The due process that Mr. Doe did receive, as the record reflects, though, is consistent with the Code of Conduct. The Code of Conduct specifically disclaims rules of evidence. It does not provide the same civil procedures that might be available in a court of law. It did not provide a hearing. It does not provide access to counsel. You know, we have been, at least some of our court members, have been critical of universities without due process, and certainly the Sixth Circuit has ruled that, in fact, overturned things because of lack of those types of hearing and notice and cross-examination. I understand, Your Honor, and I'm familiar with those cases, but I would argue that in this case the due process claims are not what are at issue. The question is whether or not the university failed to provide due process as a result of the fact that Mr. Doe was a man, and there's no indication in the record that they provide due process to women and fail to provide due process to men. There's no freestanding, and so it doesn't matter if he didn't get the types of process that you would get before these deprivations. To the extent there was any evidence in the record, Your Honor, which I would submit there is not, that he failed to receive due process because he is a man or failed to receive the procedures that are set forth under the Code of Conduct because he is a man, then there might be a separate due process claim. But there's nothing in the record to indicate that that is what happened here. Okay. Can you help us? It looks to me that the person that Rice assigned to be his helper through the process was actually a person in the office who had already sat in on her debrief. I get the Doe and the Roe mixed up. On the Roe's debriefing, and that she had been part of that process to help her in her complaint, and so she would be a particularly inappropriate person because she's already been sitting in on the part where you're hearing the complainant tell their story, their case. I don't mean it pejorative to story. And so she would not be an appropriate person then to go be his advocate. I think you're right, Your Honor. I think that this same person might have appeared. I'm not clear on that. I need to look back at the record to make sure that that was exactly correct. But, yes, I do believe that there may have been some overlap in the Title IX coordinator. A Title IX coordinator is provided to both the accused and the accuser under the Rice Code of Conduct. But it should be the same person sitting in on both. It could be, yes, Your Honor. But it shouldn't be. You're supposed to have your own representative who's hearing your side of the story and going to make your best case and help you. I'm not aware of any indication in the Rice Code of Conduct that indicates that it needs to be a separate person. And in this case, it may have been the same person. So you can sit in and help with the complainant and then go and say you're representing the respondent the next day? Well, I'm not sure that that person technically represents. It's not a counsel. It's not a lawyer or it's not an advocate necessarily for the student in the Title IX process. They are meant to provide resources to help answer questions about what the process might be. But they are not specifically an advocate for that student. And it could be the same person who is providing resources to both the accused and the accuser. Is there a fact issue of whether Doe said, Roe, I would not have had sex with you if I wasn't clean? I'm sorry, Your Honor. Is there a fact issue on whether Doe actually said, Roe, I would never have sex with you if I wasn't clean? Is there a material issue of fact on that statement? No, Your Honor. There is no material issue of fact. Mr. Doe, I don't believe, testified during the investigation that he himself said that. Ms. Roe indicated that he may have said that. That's exactly right. He did not say he made that, and the investigation seems to imply that he was lying or not being forthcoming because he said that. Well, the point that I would make, Your Honor, is that that is not a material fact issue to these questions. The issue is whether or not the information that he provided to her was sufficient to adequately disclose his illness and the ramifications. Whether or not he said he was clean or what that meant, the university still concluded that he had failed to adequately inform her of his disease and the risks. But the person is just ignorant of their disease. They have a duty to go study up on all the latest information on their disease. It's a burden on them. Yes, Your Honor. I think the university, in this case, put the burden on the carrier, Mr. Doe, as a knowing carrier, to inform himself of the transmission risks to Ms. Doe. And there's no indication in the record that he did any of that sort of research prior to his sexual contact with Ms. Doe, which in and of itself could be considered a reckless action. Does it matter whether he gave her herpes in this case? No, Your Honor. What the university concluded was that he failed to adequately inform her of the risks. Whether or not she actually received herpes from him specifically is not the crux of the issue that the university was deciding. And you have to inform even if the other person already knows? Yes, Your Honor. How do we know all that? Because that's not in any actual code. This is just all under the rubric of civility, isn't it? Yes, and under the Code of Conduct, which he was actually found culpable of, he was charged with both dating violence as well as a violation of the section of the code that says that a student should not take any action, a reckless action from which a mental or bodily harm could result. That's what he was actually found culpable of under the code. And under that standard as well as the civility standard, he was found to have not adequately disclosed his herpes diagnosis, which he both knew about and knew that was an incurable disease that he had for life at the time that he had sexual contact with her. Is that void for vagueness, civility and respect, that you can actually get kicked out for that? Well, I don't know if it's void for vagueness, Your Honor, but at least in this circumstance where we're looking at whether or not the university applies these two standards differently based on whether or not the student is a male or a female, the standard is the same. Okay, well, is it? Because she obviously was not civil in her dealings with him afterwards. Now, you could say she shouldn't be because he did something bad to her. That's a different argument. But couldn't a jury say, well, she didn't act civilly and he didn't act civilly and they only punished him? I'm out of time, Your Honor, but if I could respond to your question. Certainly. I would say that the key issue here is that no complaint was ever made against Visrow for failing to act civilly or for failing to adequately disclose or for any other behavior that Visrow had. But the heads of the office have all the information. Yes, but this is a report-based system, Your Honor, which is both set out in the code as well as detailed repeatedly in Ms. Garza's deposition, which is also in the record. All right, I have a red light question for you. Prerogatives of the presider. It's my understanding. I mean, just clarify for me. It's my understanding that the university acted based on his, quote, admission, close quote, so that any questions about her credibility were irrelevant. And so my question is a summary judgment question. He argues on appeal that summary judgment is inappropriate because the district court did not construe the evidence in a light most favorable to the non-movement, which he is. And so the first part of my question is, tell me distinctively in a declarative sentence, what is the admission that is the core of that action, and why isn't that a disputed fact for purposes of summary judgment under Rule 56? Do you follow me? I think I follow you, Your Honor, and if I don't answer it, please, I'd be happy to answer in a follow-up. The admission that he made was that he had had a run-in with herpes in high school, and it is undisputed that when he made that statement, he both knew that he had herpes at that time currently and that he would have it for life, as well as that it was an incurable disease, which is why the university concluded that her credibility was ultimately irrelevant. But I felt part of his calculus was that he inadequately or insufficiently informed him about whatever the extent of his knowledge was. And I'm having trouble divorcing that from this admission, which all seems to be kind of here, and the Rule 56, which, as you can tell, most of my questions are about why is this summary judgment on these matters. So you're saying that admission is just so straightforward that despite when he knew, what he knew, et cetera, it's just not part of the calculus that we can say that that is an admission they can act on? I'm just having trouble with it. Absolutely, Your Honor. Even if the university were to conclude incorrectly that the admission, perhaps they got the answer wrong, and perhaps they declared incorrectly that he failed to inadequately disclose his known and incurable sexually transmitted disease, this is still an appropriate summary judgment case because there is no evidence in the record that that decision, even to the extent it was an erroneous decision, was based on Mr. Doe's gender. Okay. So you're linking it to because they're filing it as a gender discrimination matter, these other matters have got to be linked to that argument. That's correct, Your Honor. Okay. All right. Any other questions from my colleagues based on what I asked? Sure. All right. Okay. Thank you for that. All right. Back to you, Ms. Hutchison. You can start with my last question. Yes, sir. The admission issue is definitely going to be a fact issue. They contend that he made this full admission, that he knew it was incurable, he knew he had a lifelong disease, and he withheld this information from her, and that is not the case. What he admitted was that he knew he had herpes, but that he did not know that it was contagious. He did not know that when he had the sexual encounters with Ms. Rowe that he was contagious. And she's an adult. I mean, she can go, she can choose to say, you know what, I don't want to have unprotected sex with you because you just told me you had herpes in high school. He's a freshman. High school was just a matter of, you know, months prior. And so, you know, she could choose to say, no, let me go find out a little bit more about it. She's not some neophyte. She literally said in an email that she had had a good amount of unprotected sex with students at Rice University in the prior three years. She also said that, as the court pointed out, that she intended, knowing she had herpes, to go sleep with a bunch more students at Rice University, and they took no action against her. They say it was because there wasn't a formal complaint filed, which is ludicrous to me. They said that the reason they had to kick my client off of campus was to protect the community. Well, her statement in that email was a threat to the Rice community. They didn't have to have somebody send a formal complaint if they have information, direct knowledge, that she poses a threat to the community, and they took no action against her. That is absolutely selective enforcement. Okay, what's on that point? What's in the counsel's offices? What is the most potent piece of the summary judgment evidence, though, that whatever they did, whether right, wrong, incomplete, was gender discrimination? I get your point about what they did or didn't do to her, but, I mean, what else is there to link to the allegation of gender discrimination? In other words, what they did to him was because it was a male. Are you making that based on what they didn't do for her, or is it something else that shows that in other cases Rice didn't act this way, they didn't kick other people off campus, they didn't put other people in rustification? I mean, what is it in the Title IX context that we look at to see at least that you ought to get another go on the gender discrimination part? Because, Your Honor, the cases say that when you have selective enforcement and an erroneous outcome and you have evidence of gender bias, that that is gender-based. And I'll give you another example. She violated the code of conduct when she lied repeatedly during the investigation. They acknowledged that she lied repeatedly during the investigation. They acknowledged that she violated the student code of conduct. They took no disciplinary action against her whatsoever. So the heart of your gender discrimination claim is what they did or didn't do relative to her, not anything else you've been able to discern about how they may have acted in other cases, not necessarily herpes, but males versus females. That's what I'm trying to understand. Is it solely based on what they did or didn't do to roll here versus, you know? Yes, Your Honor. We don't have pattern evidence. We don't. The university took the position that it didn't track that kind of information and it couldn't tell us how many times it had found on behalf of a woman or on behalf of a man. So we don't have any evidence with respect to other cases, only the way they treated Doe versus the way they treated Roe. Did he—did Donald Osteich—did he say—is this accurate that he said if the same allegations had been made against a female, he would want her canceled rather than suspended because it's a very troubling time for a female— or not for the—a very troubling time with a lot of life-changing decisions she has to make? Your Honor, that is a quote from his deposition. I asked him, would you do the same thing to a female that you did to my client, Mr. Doe, under the same circumstances and the same allegations? And he said, no, I would counsel a woman, as you said, because these are very troubling times for them. So that's different. That's not the same thing as just in this one instance we treat men and women different based upon how Doe and Roe. That's like a policy of Rice that—and he's the head person of that office? Yes, Your Honor. That he would treat a female differently? And he really said that? If I go look that up, it really says that. He really said that, Your Honor. That is a quote from his deposition. And I think that that is also, under the cases that talk about the erroneous outcome and the selective enforcement, they say comments made by those who are in charge of the investigation that are similar to that of gender bias also support a finding of Title IX violations. Okay, one last declarative sentence, if you want it. Your Honor, I think that the facts speak for themselves, and I think that they are so overwhelming that I can't believe that there are not fact issues that defeat a summary judgment in this case. All right. Thank you so much.